## HIGBY v. MARTIN et al.
## AVIS v. HIGBY et al.

Nos. 20369, 20360. June 6, 1933.

Opinion Modified and Rehearing Denied Dec. 19, 1933.

Application for Second Petition for Rehearing Withdrawn Feb. 7, 1934.

Leahy, Maxey, MacDonald & Holden, J. H. Maxey, and Chas. A. Holden, for Gladys Vance Higby.

Breckenridge & Bostick, for H. B. Martin and A. F. Moss.

Arthur B. Honnold and Mitchell & Mitchell, for Paul Avis.

SWINDALL, J. The Exchange Trust Company, as trustee under the will of Benjamin Vance, filed its final report and prayed for distribution of the assets so held by it, one-half of which belonged to Gladys Vance Higby, formerly Gladys Vance, who will be hereinafter referred to as Gladys Vance. The trust had terminated by the death of Benjamin Vance, Jr., the child of

Gladys Vance and Benjamin Vance, the testator. He had bequeathed only $5 to Gladys Vance, supposing that he had been legally divorced from her. He had devised and bequeathed one-eighth of his estate to his father, one-eighth to his mother, and the remaining three-fourths he had devised and bequeathed to his son, Benjamin Vance, Jr., to be held in trust by the testator's father, William Vance, and paid and delivered to the son when he reached 21 years of age, with a proviso that if the son died without issue the share that would have gone to him should go to the parents of the testator or to the survivor of them. The will designated the testator's father, William Vance, as guardian of the person and estate of the child, and provided that out of the accumulations from the trust estate he should receive his support, maintenance, and education.

The child died August 2, 1926, at the age of about 11 years, and by his death the trust was terminated and the future interest in the three-fourths of the testator's estate became vested.

The interest of Gladys Vance in the trust property was obtained in litigation in which the divorce judgment was set aside, in which she compromised with the grandparents in her attack upon the will, they having stipulated that she should have a one-half interest in the future estate which was contingent upon the death of the child.

The claim of Mr. Martin and Mr. Moss, who had formerly been partners under the firm name of Martin & Moss, was under an agreement of February 8, 1917, in which Gladys Vance agreed to convey to them an undivided one-half interest in whatever might come to her by inheritance from her infant son, Benjamin Vance, Jr., should she survive him. They asserted their claim by what they termed an intervention petition. The petition was amended three times, the petition and the first and second amended petitions claiming only under said agreement, but the third amended petition setting up a contract of employment under which the firm and one Paul Avis had been employed to represent her in the litigation, and also setting up an assignment of one-sixth of the proceeds from production from the allotment of deceased, and a deed purporting to convey a one-sixth interest in the allotment, the assignment and deed having been executed on the theory that she was still the wife at the testator's

death and had inherited a one-third interest in his estate. They alleged that they had acquired the interest of Paul Avis in the employment contract. Paul Avis became aware that they were asserting a claim, but did not learn upon what basis they claimed until too late to intervene prior to the hearing upon it, but he later intervened claiming a share of the recovery. The trial court held against Mrs. Vance on the Martin & Moss claim, and held against Paul Avis on his claim. Both appealed. Both claims have to do with the administration of the trust estate, and both will be considered in order in this opinion, in the event that the claim of Martin & Moss is sustained.

Soon after the discovery of oil on his allotment Benjamin Vance obtained a divorce from his wife, but obtained it by overreaching her; however, she was present and testified, and it would have been difficult to set aside the judgment but for the fact that the hearing was had and the purported judgment rendered before the petition was verified or filed. After the divorce, while in the hospital because of injuries suffered in an automobile accident, from which he later died, he executed the will referred to above. That night Mrs. Vance called upon Judge Linn, the judge before whom the divorce case had been tried. He recommended that she employ a good attorney, and she was later brought to the office of Martin & Moss by Paul Avis, a young attorney, and there the following contract was executed:

### "Contract

"This Contract, Made this 12th day of July, 1915, by and between Mrs. Gladys Vance, of the first part, and Paul Avis and Martin & Moss of the second part,

"Witnesseth: That parties of the second part, being attorneys and counselors at law, have agreed and do hereby agree and undertake to represent the party of the first part in any appropriate litigation to establish and protect her rights as the wife of Benjamin Vance and to appear for the said party of the first part in whatever proceedings may be appropriate for that purpose to recover for the party of the first part her rights as alimony or participation otherwise in the property of the said Benjamin Vance, and to set aside and void by appropriate proceedings a certain pretended decree of divorce of record in the office of the clerk of the district court of Tulsa county, Oklahoma, which pretended decree of divorce purports to have been rendered on the 7th day of May, 1915.

"And the party of the first part hereby agrees to pay to the parties of the second part, as full compensation for their services rendered and to be rendered in said matter, an amount equal to fifty (50%) per cent. of whatever may be recovered in her behalf; and it is further agreed that said sum shall be paid whether said recovery is by compromise or judgment, but that no compromise of said cause shall be made unless consented to in writing by all the parties hereto.

"In Witness Whereof, the parties hereto have hereunto set their hands this 12th day of July, 1915.

"Gladys Vance,

"Party of the First Part.

"Paul Avis,

"Martin & Moss,

"Parties of the Second Part."

There was much litigation, all subsequent to the testator's death. There were guardianship proceedings, probate proceedings, and what the attorneys term a suit in equity to set aside the divorce and to construe and set aside the will, in which there was an application made for a receiver. That was the principal action. The fee contract is silent as to proceedings involving the custody of the child, but it was admitted by the attorneys that that was her chief concern in the interview at which the fee contract was executed, and evidently such proceedings were within the contemplation of the parties as covered by the agreement.

Mrs. Vance was not a Creek citizen, and her right to inherit an interest in the allotment depended upon whether section 6 of the Supplemental Creek Agreement governed a descent cast after statehood. The United States court had held the section inapplicable, and that the statute of descent and distribution of Oklahoma applied, but prior to the trial of this case this court held the section applicable and did not abandon that position until after the termination of the litigation. The district court set aside the divorce and followed the holding of the United States district court and held that Mrs. Vance inherited one-third of all the estate, which consisted of about $38,000 in money and property other than the allotment, and also the allotment.

The litigation resulted in numerous actions and several appeals, but was all terminated as a result of a stipulation upon which the appeal from the district court

action was settled. That settlement was pursuant to a stipulation made between Mrs. Vance and the testator's parents. In it she assigned to William Vance all her interest in the estate. In consideration of that she was to be paid $19,000, which was equal to one-half of the assets of the estate other than the allotment, instead of the one-third which she could claim in opposition to the will, and it was further agreed that she should have an interest in the allotment, not an absolute interest of any character, the testator's parents retaining the one-eighth interest which each had under the will, but agreeing that Mrs. Vance should have a half interest in the future interest covering the three-fourths held in trust to go over in the event of the death of the child under 21 years of age. The stipulation took a most peculiar form in that it stipulated that this court should construe the will in accordance with the provisions of the stipulation, and, stranger still, that is exactly what the judgment of this court purported to do, but it is immaterial whether we consider that she took under the stipulation or under the judgment, just as it will further appear that it is unnecessary to determine just what sort of an estate the child had in the three-fourths, or just how the mother took upon his death.

After the settlement the $19,000 was divided between Mrs. Vance and Martin & Moss, and she executed in final settlement with them the following agreement:

"This Contract, Made this 8th day of February, 1917, by and between Gladys Vance, party of the first part, and H. B. Martin and A. F. Moss, parties of the second part, Witnesseth:

"That for and in consideration of one dollar and other good and valuable considerations, the receipt whereof by the party of the first part from the parties of the second part is hereby acknowledged, the party of the first part has agreed, contracted and covenanted and does hereby agree, contract and covenant, to and with the parties of the second part, their heirs and assigns, to convey, transfer, assign and set over by appropriate deed and instruments of conveyance an undivided one-half of whatever property, real or personal that may come to first party by inheritance from her infant son, Benjamin Vance, Junior, if the party of the first part shall survive the said Benjamin Vance, Junior.

"This includes the following described real property, lying, situate and being in

the county of Creek, and state of Oklahoma, to wit: The northeast quarter of section 7, township 18, north, range 7, east.

"And it is further contracted and agreed that this contract shall extend to and be binding upon all of the parties hereto, and each and every their heirs, executors, administrators and assigns.

"In Witness Whereof, we have hereunto set our hands this the day and year first above written.

"Gladys Vance,
"Party of the First part."
"H. B. Martin,
"A. F. Moss."

"[Attested; Notarized]"

Much of the evidence related to the work and diligence of the attorneys. It was not contended that they were lacking in diligence or that the litigation was mismanaged in any manner, and all that evidence was wholly immaterial.

After the testator's death the parties clearly recognized the employment contract as the basis of all of the services rendered by the attorneys, and in the light of its terms and the circumstances under which it was executed it certainly was broad enough to serve as such a basis. The conveyances made after his death and only two days before the institution of the district court action followed the fee contract. There was no other contract. All the services were properly referable to that contract.

Mrs. Vance insists that we should consider on the claim of Martin & Moss also the evidence taken on the hearing on the claim of Mr. Avis. We have done so, but we find nothing in it that would cause us to reach a different conclusion on the claim of Martin & Moss than we otherwise would have reached. At the hearing on the Avis claim they denied that all the services had been rendered under the employment contract, but we think the reason for that change is clearly apparent, and that it did not detract from a proper conclusion from the circumstances under which the contract was drawn and the broad scope of the terms of it, and we conclude in spite of the variance in their evidence that they did consider that they rendered all of the services under that contract, just as in truth they did render them all under it, and in considering this variance we are impressed by the prompt, unhesitating manner in which they declared it at the first hearing, deliberately pointing to the scope of the terms and pointing out that they were drawn that broad just to provide against whatever contingencies might happen after the making of it. This variation and change of front will be seen to be very material in the consideration of the claim of Paul Avis, but we have not yet reached that point and cannot reach it unless the recovery of Mr. Martin and Mr. Moss is sustained, unless some other ground might be found to sustain it, even though our holding should be against them.

She asserted that the agreement of February 8, 1917, should be strictly construed, and that the half interest in the future estate did not come to her by inheritance from the boy, and that, consequently, that agreement did not cover it. She asserts that they could not otherwise recover, for their claim would be barred by the statutes of limitations. She contends, also, that the fee contract was illegal because against public policy, because, being on a contingent basis, it affected the freedom and security of the marriage relation. They assert that it was not an agreement to obtain a divorce, but to set aside a divorce. We cannot distinguish between such contracts on that ground, for one would be as likely as the other to effect the objectionable end. It is clear, however, that the legality of the agreement is not to be decided, for even though her contention is correct, since no steps were taken under the contract until after the death of Benjamin Vance, it was then not only true that the agreement could be legally performed, but the reason for holding it illegal, its tendency to affect the freedom and security of the marriage relation, would no longer apply, for the plain reason that by the death the relation had been terminated. The purpose then would be merely to obtain for the wife participation in the estate, which would necessitate setting aside the divorce judgment, with no relationship existing to be affected by conduct of the attorneys governed by their individual interest.

She also asserts that the employment agreement was illegal because it denied in terms the right to compromise without consent of the attorneys. That provision was separable and did not render the whole agreement illegal. Culver v. Diamond, 64 Okla. 271, 167 P. 223.

She further contends that the deed and assignment taken before the institution of the district court action were taken only

as security; but, while some questions had to do with that matter, and the attorneys had used the word "secure," we observe that the deeds followed the contract by covering only half of her asserted interest, although it was a conveyance of property and not a payment of money, but payment by conveyance of property in lieu of money where property is to be recovered is a common mode of settlement. But this was asserted only as a basis for denying enforcement of them as security, with the contention that the right to recover the fee so secured was barred by the statutes of limitations.

If the agreement of February 8, 1917, covers the interest in litigation here, this question is immaterial, and certainly no statute of limitations bars recovery on it if it does cover that interest, for performance on that was not contemplated until the death of the boy. That an interest in the future estate was presently alienable and could have been conveyed immediately upon settlement becomes immaterial, for even so, they might agree that it would be conveyed in the future, so that the right to recover it would not be lost until the statute might run after the breach of such an agreement. Manifestly, if this agreement of February 8, 1917, covered this interest, the claim of Martin & Moss was properly allowed against Mrs. Vance.

Her contention that the agreement of February 8, 1917, does not cover the interest in question is premised upon several claims—that the word "inheritance" is a technical word and does not apply to the interest; that the word is not ambiguous; that if it were ambiguous it should be construed against the attorneys for two reasons: First, because they used the word; and second, because they were attorneys skilled in the law and would for that reason be held to have used the word in a technical sense; and that a contract between attorney and client should be construed against the attorneys in case of ambiguity.

There would be merit in these contentions as to presumptions if the problem of construction or interpretation should get to the point where there would be room for their application, but she relies upon secondary rules which do not come into play if the agreement can be otherwise given an effective meaning or sense, and, also, as will be seen, her contention that the word "in-

heritance" is not ambiguous is erroneous, as is her contention for interpretation in a legal sense.

Interpretation of a writing is a process by which a court seeks to ascertain what effective sense it expresses. Originally the courts accorded effect to no sense other than under normal and popular usage except when dealing with words whose meaning the law defined, interpreting the latter class of words in their legal sense, and interpreting other words in the normal and popular sense. Also, it was originally thought that words were symbols having as a rule fixedness and singleness of sense, so that the meaning of the writing could be ascertained from merely reading it, except where there might be some word used which was of double meaning, the presence of which would be readily apparent on reading the writing, so that it was only in these cases, which were supposed to be rare cases, that it was thought necessary to go beyond merely reading the writing to ascertain what expressed sense was intended by the parties. From this old idea of fixedness and singleness arose the rule against distributing a clear meaning. But as usage varies so do asserted senses differ, and finally the courts had to recognize that there were differences in usage, individual usage, mutual usage, local or class usage, and normal and popular usage, for sense under these different usages competed for recognition, and the different sorts of usage were urged as what Wigmore terms "standards of interpretation," which he classes according to usage as: (1) The individual; (2) the mutual; (3) the local or class; and (4) the normal and popular. The individual standard is often accorded effect in the interpretation of wills, but in the interpretation of contracts it is recognized that the standard should at least be a mutual one, and at the present time the struggle is by the mutual standard for recognition. The local or class standard is now recognized, the problem being to determine in what case it applies. The normal and popular standard has always been recognized, but even as to that the problem is to determine when it is applicable.

For a long time words were given effect in their legal sense in preference to their normal and popular sense, but such is not the case in this jurisdiction. How far, if at all, recognition is to be given to a mutual standard is not for decision in the present

case, for, as will be seen, the only problem is to choose between the legal sense and a normal and popular sense of the word "inheritance."

If the word "inheritance" in normal and popular usage would properly be used to refer to such an interest as is here in controversy, although it would be necessary to resort to extrinsic circumstances to indicate just what normal and popular sense of the word was intended, still, when ascertained, it would be properly classed as a normal and popular sense, and it should not be classed as a mutual sense just because until the circumstances are known the intended sense is not apparent to others than the parties to the agreement. We do not have a sense properly classed as a mutual sense until when intended sense is apparent we find it expressed by a usage differing from the normal and popular usage.

Nobody trained in the law always uses the words of his profession in a proper legal sense, for all at times make mistakes. But such training tends to correct usage, and it tends to cause the legal mind to regard the use of words in a sense other than their legal sense as an erroneous use of them. As a matter of fact, it was at first the impression of the writer that the word "inheritance" would not in normal and popular usage cover the interest in question, in spite of the fact that under such usage the word has an extremely wide scope of senses, which indicates that the word is most ambiguous, even without resorting to the circumstances surrounding any particular parties to bring its ambiguity to light. Immediately, and without reference to these circumstances, we must recognize that it is ambiguous. As a matter of fact, when we consider the scope of sense expressed by the word, we find that we have in the present case many indicia present when the word is used in a legal sense which are not at all necessarily present when the word is used in a normal and popular sense. We have the fact that the interest would not vest until the death of the boy, which was a condition; we have the fact that the mother was the heir of the boy; and we have the fact that the property was property in which the boy had an interest. We lack merely the differentiating circumstances of it coming to her because of the boy's intestacy. Much of the briefs were devoted to a discussion of the character of the boy's interest, all of which, because of

the breadth and scope of the word in normal and popular usage, was wholly immaterial.

An examination of the cases indicates that in many jurisdictions the court still prefers giving effect to the legal sense of words, sometimes only to the point where it does not appear to violate intention, but sometimes even to the point where unless effect is given to the sense intended the instrument would be wholly meaningless or have no subject-matter upon which to operate. We are not in this jurisdiction concerned with that matter of preference as to standards. What we desire to point out is that when in the cases effect is given to a sense other than the legal sense of the word "inheritance," the courts have not done so with the thought that they were according effect to a mutual sense, an erroneous use of the word, but that they were merely according effect to a proper sense under normal and popular usage.

In Graham v. Knowles (Pa.) 21 Atl. 398, it was held that a devise of "all my estate, both real and personal, that **I shall inherit as my portion after my father's death,"** carried the title to lands already inherited from the mother, in which the father had merely a life estate by curtesy. The court said:

"By the words 'that I shall inherit as my portion after my father's death' she must have meant property into the actual possession and enjoyment of which she would come at the decease of her father. The word 'inherit' was not used in a technical sense. It often means 'to become possessed of;' and in that sense it was doubtless employed by the testatrix."

In Quinn v. Hall (R. I.) 91 Atl. 72, at page 76, Ann. Cas. 1917C, 373, it was said:

"It may be admitted that in its strictest technical sense the word 'inherit' means to take as an heir at law, by descent. While words are to be construed according to their technical meaning whenever possible, nevertheless the courts have not hesitated to adopt a broader interpretation whenever necessary to effectuate the intent of the testator. Especially is this true in the case of the word 'inherit,' which is very commonly used to describe some method, aside from descent, by which property is taken on one's death."

In Kohl v. Frederick et al. (Iowa) 88 N. W. 1055, it was said:

"The intention of the parties to a contract is of course always to be sought, and if the language used, though technical, is applicable to the then condition of the parties, so that by giving it its technical meaning the contract may be given force, parol evidence cannot be received to show a dif-

ferent intention on the part of the makers thereof. But where by giving a word its strict technical legal meaning, a contract will be rendered entirely meaningless, it is competent to show by parol the sense in which it was used, if it is used by laymen in a different sense, or has a popular or common meaning, if by doing so the contract may be given force and effect. (Here follow citations.) * * * To construe the word 'inherit' strictly will deprive the contract of all force, and leave it a mere nullity, while to say that it was intended by the parties to mean 'take' or 'to have' makes, what they certainly intended, a valid contract."

In Re White's Estate, 42 Wash. 360, 84 P. 831, in discussing the meaning of the word "inheritance" in the title of an inheritance tax statute, the court said:

"The word 'inheritance' is no doubt properly confined to lands and tenements which pass by descent or by operation of law, but in popular use this distinction is often disregarded, and this is especially true in succession or inheritance tax laws. The terms 'inherit,' 'inheritance,' and 'inheritance tax law' have been thus defined by lexicographers: Century Dictionary: 'Inherit: in law is used in contradistinction to acquiring by will, but in popular use this distinction is often disregarded. * * * (3) To receive by transmission in any way; have imparted to or conferred upon, acquire from any source,' 'Inheritance * * * (4) A possession received by gift or without purchase; a permanent possession. (5) Possession; ownership acquisition.' 'Inheritance tax law * * *' In contracts and wills the term 'inherit' is often construed to mean 'to take,' 'to have,' 'to receive,' or 'to become possessed of'."

And in a very recent dictionary, Webster's New International Dictionary, in the edition of 1930, we find the following:

"Inherit. (5) To come into possession of; to possess; to receive; to obtain; to enjoy as a possession."

And:

"Inheritance. Possession or right of possession; ownership."

So far as the word "inheritance" is concerned, we do not resort to the circumstances under which it was used in this case to ascertain that the word is very ambiguous and most indefinite in sense in normal and popular usage. The case resolves itself into one of considering whether the normal popular standard is applicable, and if so, whether the circumstances indicate what sense under it the parties intended to express by the word.

In this jurisdiction we have a statute which prefers sense under normal and popular usage to the strict legal sense of words. It is section 5047, C. O. S. 1921, and it reads as follows:

"5047. Words to be taken in ordinary sense. The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."

Mrs. Vance urged that section as applicable, but, strangely enough, Martin & Moss urged section 5048, and since in one place in the brief Mrs. Vance also referred to it, it will be considered. It reads as follows:

"5048. Technical words. Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense."

We do not think this latter section applicable as to words in a legal sense, because section 5047 seems plainly to the contrary, at least where one of the parties is a lay individual. But, however that may be, under the latter section the technical sense would not apply, as the words were clearly used in a different sense, and we have no difficulty in concluding that they were used by the parties in a normal and popular sense.

Mrs. Vance cited Romans v. Shannon, 80 Okla. 199, 195 P. 298, to the point that parol evidence is not admissible in aid of interpretation of an unambiguous contract. There the court rejected an asserted sense in the business of road construction because the sense of the words was clear in normal and popular usage. If for some reason the court should have rejected local or class sense in that case, its conclusion was correct, but the language was unfortunately chosen, for if local or class sense is accorded effect as a proper standard of interpretation in any case, it matters not how clear the words used may be in normal and popular usage, for that must yield to a class or local sense if such is proved, the problem being to determine if the standard applies, and to determine the weight of the evidence offered to establish it.

She also cited Sternwear Tire & Rubber Company of Oklahoma v. Marion Tire & Rubber Company, 88 Okla. 117, 212 P. 134, to the same point. There a buyer who had agreed to handle the seller's produce exclu-

sively contended that this constituted also an agreement by the seller that the buyer should have the exclusive right to handle the seller's products. The court denied that the words expressed any such sense.

It is unnecessary to consider in this case the common declaration that resort will not be had to extrinsic circumstances in aid of interpretation unless the agreement is ambiguous, under which it is often asserted that such circumstances cannot be resorted to to establish ambiguity, but only to attempt to resolve it when it appears already that there is an ambiguity. As to that, the writer has a decided opinion which it is unnecessary to express in this case. Here we can ascertain that the word "inheritance" is most ambiguous, and this appears before any resort is had to the circumstances of the particular case here before us.

No other relationship between the parties appeared but that of attorney and client. No relationship of vendor and vendee was shown. They had been employed by her and she had agreed to compensate them by a sum equal to one-half of whatever she might recover through their services. She had recovered some money, and she had recovered an interest in this future estate. The money had been divided. She asserts that the division of the money was not equal, but if not, the inequality came about by reason of charging against her some expenses which she could not have been required to pay. Nothing had been done with regard to the other property interest which was recovered. It is true that she had purported to assign them a one-sixth of the proceeds of runs from the allotment, and to convey them an undivided one-sixth interest in the fee title to the allotment, but those conveyances had been rendered nugatory by the settlement with the grandparents in which she had conveyed her entire interest in the estate to William Vance. In the agreement they referred to the allotment by its legal description, which is a circumstance of weight with regard to their intended sense, but of course could not be effective if we had not concluded that the normal and popular sense of the word "inheritance" was broad enough to cover the interest in controversy. The vice in this agreement did not lie in using the word "inheritance" in a normal and popular sense, nor is it more strange that a lawyer would use the word in that broad sense than was the sort of the stipulation which was drawn, one providing that this court should construe the will to mean

what it did not mean and to mean something utterly repugnant to what it could mean, nor the conduct of this court in rendering judgment according to the literal terms of any such stipulation. Since we are able to ascertain what sense was intended by the parties, and that both intended to use the word to cover the interest in controversy, we cannot construe the word against the claimants in opposition to the sense intended by all the parties, just because they are lawyers. They had no reason to suppose that she would not think that they used the word to cover that interest. The primary rules of construction or interpretation indicate the intended sense beyond doubt.

Nor would we think that they used it in a sense broader than indicated by these circumstances, but for the statement of Mr. Martin that when he was engaged in dictating it it occurred to him that something might come to her by the death of the boy that would not come to her by reason of the judgment rendered pursuant to the stipulation, and that from something she said he was of the opinion that she had the same thing in mind. Such a situation far from indicated a proper explanation to her of the effect of executing an agreement using the word in any such broad sense, and to that extent the agreement was without consideration, and being without consideration so far as there was an intention to use it in a sense broad enough to include anything other than what the settlement permitted them to have, which had already been fixed by the employment agreement, it is unnecessary to consider the contention that the agreement was illegal as an agreement by an heir to convey an expectancy.

But we cannot escape the conclusion that had it not been for this attempt to use the word to include this sort of an interest, to which they were not entitled, the attorneys might have used a word better chosen, and one not calculated to bring about all this litigation. The litigation resulted from carelessness from the standpoint of skill in conveyancing which came about by reason of Mr. Martin having his mind fixed partly on providing for something to which the attorneys were in no sense entitled. Upon the death of the boy it appeared that this interest in controversy became vested, and that also there was about $8,000 belonging to the boy, which, less the costs and expenses of administration, would come to the mother as his heir. Since their own carelessness

and want of skill drove her to consult an attorney when such a situation presented itself, and she naturally relied upon their advice, and since their position was far from frivolous, but was one which in the light of decisions in other jurisdictions where the legal standard is preferred, was well calculated to induce them to insist upon an interpretation of the agreement by a court of last resort, we do not think that the claimants are equitably entitled to one-half of the trust property in the condition in which it was at the time of the decision of the trial judge, with a right to insist upon recovery of any loss by reason of the interest on the fund in the meantime having been less than legal interest, if such should turn out to be the case, or to recover for any shrinkage in principal value of assets during the period of slump and depression under which the country now labors, if any such shrinkage has occurred, so we hold them entitled only to one-half of the trust property in the condition in which it shall be when the trial court pursuant to this decision makes division of it. We think it fair that the costs should be paid out of the fund before division, and so borne equally; that is, the costs accrued and accruing upon the claim of Martin & Moss against Mrs. Vance. Further than that, before anything is paid to Martin & Moss, they shall satisfy the trial judge that they have received nothing in the distribution of the estate of the boy in administration, or if they have, what amount was so received, any amount so received to be deducted from what shall be paid to Martin & Moss and paid to Mrs. Vance in addition to her one-half of the trust assets. The recovery under the agreement of February 8, 1917, cannot be paid over to Martin & Moss until decision upon the appeal of Paul Avis, which we shall now consider.

On the contention that the appeals should not be considered on the record of both hearings, we find the following in the record:

"Mr. Honnold: Now, do I understand that all of the evidence that was taken in Mr. Avis' absence will be considered? The Court: Oh, yes. Mr. Honnold: As though taken at this time? The Court: Yes, sir. Mr. Honnold: Of course I am rather handicapped by not having heard that evidence. (Page 588.) * * * Mr. Breckenridge: Now, as I understand it, your Honor, you are going to consider this testimony taken on this other hearing in this case, and let us understand if what I asked Mrs. Higby took place at the former trial, and the record so

discloses, it, it will be part of this testimony without by calling the reporter, and having him read it into the record? The Court: Yes, sir. Mr. Breckenridge: All right, with that understanding that is sufficient." (Pages 597-598.)

We have read the evidence carefully, and that of Paul Avis had one great merit, that of consistency. He was frank and straightforward. He stated how the employment came about—that he was told by Mr. Evers, with whom he formerly had officed, who was then a deputy in the office of Mr. Crossland, the county attorney, that a man would be in to see him about the case the next day. The next day a Mr. Egan came in and told him that Mrs. Vance would be in to see him, and later told him that Mrs. Vance wished him to come to the house. That morning he had checked the files in the divorce action, and he says that he was told by the clerk of the irregularity in obtaining the divorce judgment. He went to see Mr. Martin about associating his firm in the matter and was told to bring in Mrs. Vance, which resulted in the execution of the employment agreement. He said that he told Mr. Martin that there were some moral obligations to be taken care of, and that Mr. Martin said that they would be taken care of and the remainder of the fee would be divided equally between his firm and Mr. Avis. They denied knowing of any moral obligations, but did not deny that the fees were to be divided equally. Nothing was done until after the death of Benjamin Vance, but after that proceedings to probate the will were instituted, while Mr. Martin and Mr. Moss were absent on their vacations, and Mr. Avis did some work in connection with those proceedings. There was a dispute as to whether he rendered any services after their return, but it seems clear that he rendered all that he was permitted to render. Both Mr. Martin and Mr. Moss asserted positively that they had never felt the need of, nor desired, his assistance. Further than that, Mr. Martin said that upon his return from his vacation he learned that Mr. Avis had been rendering some services, and that he took the matter up with the client, carefully pointing out to her, as he said, that she was entitled to his services under the contract if she desired them. It does not appear that there had been any disagreement between the attorneys as to matters of policy or tactics, or that Paul Avis was at all unwilling to permit them to have entire charge of the management of the litigation,

and this conversation with the client, which we can only regard as unnecessary and surprising, can be considered only as an unjustified complaint. Mr. Martin said that she replied that she did not desire Mr. Avis' services, and that she complained of the way he had got the business. In another place he asserted that he was not in sympathy with the manner in which it was obtained. But, as will be seen, the weight of the evidence indicates that he was aware from the beginning of these so-called moral obligations, and nothing in the evidence indicates that either Mrs. Vance or Mr. Martin ever made complaint of that character to Mr. Avis, and any change in the relationship which may have come about occurred for admittedly different reasons, for she denied that Mr. Avis had withdrawn to her knowledge, or with her consent, and they themselves asserted that there was an agreed withdrawal by Mr. Avis, of his own suggestion, due to consideration of the great amount of work involved in the employment, about which more will be necessarily said later. Mr. Avis said that when the district court action was filed he learned that his name had been omitted from the petition, and that he complained to Mr. Martin, and was told that by reason of work which he was doing on the outside, it would be better if he did no appear openly as an attorney, and, further, that if his name were on the petition, he would have to be consulted and would have to sign stipulations, and, anyway, he had his contract and was fully protected by that. There was a conflict as to how much service he did render after their return from their vacations, but it appears beyond dispute that he kept closely in touch with what was being done, and it is clear that he did as much as he was permitted to do, and that he was at all times ready, able, and willing to do whatever they might wish or permit him to do.

On the other hand, we do not find the same frankness or consistency in the positions taken by his opponents, or in the evidence which they gave.

In the first place, we find a surprising change of attitude taken at this last hearing as to whether all the services rendered the client were rendered under the contract of July 12, 1915. In spite of the unhesitating, unequivocal declaration at the first hearing that they were all rendered under that contract, explained by pointing to the breadth and scope of its terms, and following that by declaring that nobody ever thought of such a thing as a new contract just because Benjamin Vance had died, at the second hearing they denied that all of the services had been rendered under that contract. They said that they had no other express contract; they denied that they claimed anything on a quantum meruit basis. The position seems to have been that the contract was not the basis on which all the services had been rendered, but yet it was a kind of a measuring stick for compensation for all of the services. We cannot think that this change from the earlier view, which was clearly the correct view, deliberately formed and explained as the view had been, was due to a change of opinion, and the only reason apparent is that at the second hearing, at which Paul Avis was claiming part of the fees, it was to their interest to take the contrary position. But the testimony at this second hearing is in itself conflicting, for in asserting a substituted agreement and how it came about, Mr. Martin said that in a conversation in his office after his return from his vacation, at which Mrs. Vance and Mr. Avis were present, it was admitted that the contract bound them to render all of the services to Mrs. Vance, but as a matter of fact the death of Benjamin Vance had necessitated services which had not in fact been contemplated when the agreement was executed, and that then Mr. Avis said that since he was inexperienced and in all probability they would have to do about all of the work, he would be willing to withdraw from further participation, and that it was agreed that he would do so, and that he would have a reasonable fee out of the recovery for what he had done to that time. This alleged agreement will be considered later, but at the present we compare it with the answer which they made to his petition, and again we find a most striking inconsistency. In the answer they charged that he had entered the service of the United States and left Tulsa, and abandoned the employment, and complained that this necessitated their doing all of the work, that they did all of it, and that he did none of it. In the answer they asserted that later they paid him $500, alleging that it was paid pursuant to a prior oral agreement to the general effect that he would have reasonable compensation for what he had done, but that does not at all assert anything repugnant to their allegation of abandonment, merely indicating a promise to pay something in spite of a former abandonment. The plea of abandonment and the asserted withdrawal agreement were repugnant. The evidence clearly shows

that Paul Avis did not enter the service and leave Tulsa until after all of the cases had been tried and were on appeal, and that allegation was made in his reply to their answer, and they were apprised of the impossibility of relying upon his leaving Tulsa as an abandonment prior to the hearing.

Now, let us consider this asserted agreement to withdraw and that he would be paid what would be a reasonable fee for what he had done. They assert that this was at his suggestion as a result of the discussion as to the amount of work in prospect. They assert that the agreement was oral. They assert that it was that he would have what would be reasonable, and that it would be only for what he had done up to that time. Any such agreement would be a remarkable agreement under the circumstances. Paul Avis had not met with much financial success in the practice, and this case meant much to him. Further, it does not seem that the death of Benjamin Vance was not contemplated when the employment agreement was made, but, however that may be, his death did not affect adversely the value of the employment, for if the divorce could be set aside, she could as his statutory heir take in opposition to his will one-third of his estate, except as they might be able to successfully contend that the provisions of section 6 of the Creek Supplemental Agreement would apply and deny her a right to inherit an interest in the allotment, and at that time the United States court had taken the position that the section would not apply to a descent case after statehood, and at that time this court had not taken the contrary position which it later took and subsequently abandoned. That he would voluntarily withdraw seems very strange; that he would agree to take only reasonable compensation and on such a basis as the value of services rather than some fractional interest in the fee, seems strange, and above all it seems strange that an oral agreement would be made. If one was made, it was the only place during the relationships between the parties where Martin & Moss failed to adequately protect their interest by a written agreement, beginning with the employment contract, followed by the assignment and deed, and culminating in the settlement agreement of February 8, 1917, and we do not conclude that reducing the assignment, deed, or settlement agreement to writing was due merely to a necessity of complying with the statute of frauds, but rather that it had its basis in good, sound, business judgment prompting them to have such agreements in writing. We cannot consider that the evidence that Mrs. Vance complained to Mr. Martin of the alleged improper manner in which the business was obtained, nor the remark of Mr. Martin that he was displeased when he found out about it, as entitled to consideration, for the reason that the evidence quite clearly shows that Mr. Martin was aware of these so-called moral obligations from the beginning, and it does not appear that anybody asserted any such reason to Mr. Avis or urged that he withdraw, since they assert that the agreement was of his own volition and induced by a discussion as to the amount of work in prospect. Nor can we think that such a conversation would induce any such volunteering on his part, for we cannot think that the death of Benjamin Vance was not in contemplation, and the very fact that he employed Martin & Moss indicated that it was anticipated that the heavy burden would fall on them, nor was Mr. Martin at all deceived as to that, for he said that when Mr. Avis came into his office on the day that the agreement was made, he knew who Mr. Avis was and had always supposed him to be merely a stenographer and was surprised to learn that he was an attorney.

We find no reason for complaining to the client because Paul Avis had rendered services, nor can we find any good reason for complaining about the amount of work in prospect, yet Mr. Martin himself testified that he made the complaint to the client because Mr. Avis had served, and he was the one who testified about the conversation in his office after the death of Benjamin Vance and his return from his vacation in which there was this discussion about that. If these two facts indicate anything, they indicate a desire to be rid of Paul Avis. But we cannot concede that the evidence indicates the making of any such agreement as they assert was made. Paul Avis denies the making of any withdrawal agreement, and he said that he complained subsequent to that time of omitting his name from the petition in the district court action.

We find them asserting in their claim against Mrs. Vance in their third amended petition, which was the one in which the employment agreement was first set up by them, that they had acquired the interest of Paul Avis in that agreement, with no definite statement of how they had acquired it. We next find them asserting in answer to

his claim against the fund that he had abandoned the employment. After his declaration in his reply that he had not left Tulsa until after all of the cases had been tried and were on appeal, we find them asserting an alleged agreement of withdrawal instead of an abandonment, which was a remarkably strange sort of an agreement, and we find them taking this different position as to whether all of the services were rendered under the employment agreement, which we can only take as in the nature of a feeling of weakness in their position.

We can only conclude that, as the evidence was when all parties rested and when Mr. Honnold, counsel for Mr. Avis, moved for leave to amend the prayer of the petition to claim 50 per cent. of the fee instead of the 20 per cent. originally prayed for, that it had been agreed originally that Mr. Avis should have half of the fee, and that the matters set up by them as depriving him of that agreed division were against the clear weight of the evidence, so that he stood under the evidence as entitled to half of the fees.

Before we consider further proceedings, we should observe that Judge Linn testified that in the conversation with Mrs. Vance at his house the night before the employment agreement was executed, at her insistence that he recommend some attorneys, he recommended Martin & Moss. That Paul Avis got the business would not be a violation of any legal right of Martin & Moss, but, further, we can only think that Judge Linn was under a misapprehension as to the real facts. They said that they had not learned of this advice until two or three days prior to the hearing on the claim of Mr. Avis. And it seems remarkable that if Mrs. Vance had been advised to employ them they would not have learned of it from her when she ascertained that she had in fact employed them, especially in view of the conversation which Mr. Martin said occurred when he complained because Paul Avis had been rendering services. This would indicate that whatever was said by Judge Linn, if anything, was said out of her presence, that possibly in a conversation between Judge Linn and Mr. Evers as to who would be good attorneys, or that possibly from seeing Martin & Moss at the numerous hearings and his opinion that they were good attorneys, he became of the opinion that he had advised her to employ them when his advice had in fact been general, merely to employ good attorneys. However it may have been, had she received

such advice, we cannot think that Martin & Moss would have remained ignorant of the fact until two or three days before this hearing on the claim of Mr. Avis.

We shall consider this matter of the right to recover before we consider the alleged estoppel from claiming more by accepting the $500 which was paid him.

Mr. Honnold had not merely prayed for 20 per cent. He had alleged in the petition that Mr. Avis had a one-fifth interest in the fee. He did not allege any substituted agreement in the original petition. It appears that while Mr. Avis was in the army his trunk was stolen from where he had left it in Tulsa, and that it contained what valuable papers he had, and he had no copy of any written substituted agreement which may have been executed. After they answered his petition and charged him with abandonment, they moved to dismiss his petition. To that motion he filed a response and to the response he attached a copy of a reply which he threatened to file to their answer in the event they did not amend their answer and include an accounting as to what disposition they had made of the $9,500 received in money on the division after the settlement of the litigation. This response was filed October 13, 1928, and in the threatened reply he denied the abandonment, alleged that by a substituted agreement he was to have 20 per cent. of the fee and they were to have 80 per cent., having the additional 30 per cent. for use in paying all expenses of every kind and nature connected with the said litigation, including the compensation of evidence men and detectives and of others who had rendered and might render valuable services to the intervener and to Martin & Moss, that his duplicate of the agreement was lost while he was in the service, but that they had a duplicate which he demanded that they produce. He further asserted in this threatened reply that unless they accounted he would at the hearing ask leave to amend his prayer to ask for 50 per cent. of the fee. They did not amend their answer, and the reply that he filed set up an agreement for equal division, and was silent as to the substituted agreement. Manifestly that was done under the theory that the substituted agreement was subject to conditions, but we do not so read the assertion as to it, for it was an agreement that he would have 20 per cent. and they would have 80 per cent. We do not think that this 30 per cent. was considered as a trust fund, the recital as to it

appears to have been the assigning of a reason for the changed proportion as to division of the fees. He alleged no breach, but at the hearing, in answer to the question whether the moral obligations had been paid, he said that he thought that they had. Further, it appears that Mr. Martin told him that all obligations had been met and he had not asked for a more specific statement, if he was entitled to it.

When this motion for leave to amend was made, the attention of the judge was called to the response and the attached proposed reply, and Martin & Moss urged it as an admission and also moved for judgment in their favor on the ground that no such agreement was proved. The court properly held that it was an admission, but erroneously concluded that no such agreement had been proved.

As a matter of fact, the petition itself had alleged that he had a 20 per cent. interest in the fees, and their answer setting up their alleged defense was directed to such an allegation. Because they did not amend the answer he had filed a reply setting up the original agreement, and made proof of it, but before Mr. Avis left the stand his counsel asked him if he had any other agreement, and in view of the fact that he had already twice sworn that he had the agreement for 20 per cent., he would have testified to such an agreement, but his opponents objected to the question, and upon their objection it was withdrawn. In the first place, these proceedings were for the distribution of the trust fund, and the parties had not brought formal actions. Further, they were not entitled to a jury, but to a trial only before the judge, and we do not consider that he was bound by strict rules of procedure. He should have considered the sworn assertions as evidence when they came to light, and especially since it was a fact that the claimant had offered to support the assertion by his testimony, for the question asked him could have had no other purpose than to bring out testimony as to such an agreement. Considering it in that light, it was error to conclude that proof had not been made of such an agreement, and it is also true that they had framed issues on it, and had not only been permitted to introduce evidence in support of the defense pleaded, abandonment, but also had been permitted to assert a different substituted agreement, one to take what would be a reasonable fee for

what he had done prior to the time of the making of the agreement. They had already tried out what defenses they might urge, and on all of them the weight of the evidence was clearly against them. They could offer no other defense, and no good reason would be served in sending the matter back for a new trial. Indeed, to do so would be error, for such an agreement should be considered as established.

On the other hand, it should be established as an unqualified agreement to take 20 per cent., not only because his opponents answered to such an alleged agreement and it was in effect proved, but because he did not prove that there were any conditions attached to it which would relieve him from the obligation. As set up in the proposed reply it was an agreement that they should take the lead, and that they should have 80 per cent. and he 20 per cent. of the fees. It was said that they should have the 30 per cent. for use in paying all expenses, but that did not indicate that it was a trust fund, or that paying such expenses was conditional. The 30 was to be used out of their 80, and if it was conditional, that should have been alleged and a breach should have been proved.

His counsel may have relied on a line of cases appearing in his brief in which it was held that where an allegation which from one point of view is an admission is denied by an opponent, and evidence taken upon the issues indicates what is the fact and shows it to be not what was alleged, the party making the allegation is not to be held to an admission appearing from the allegation, but the court will hold to the fact as proven. If so, he erroneously considered that he was entitled to the 50 per cent. in spite of the admission, for this case does not present any such situation as the cases cited. So far as appears, there was an agreement that he should have 20 per cent. He alleged it, and after proving the original agreement for 50, he offered to testify to what he had twice asserted under oath, that he had agreed to take 20. The proof was, therefore, that he agreed to take 20 per cent. They urged what they had as defense to the allegation, and the evidence was clearly against the defenses. On the other hand, he did not establish that the 30 per cent. was a trust fund with a balance to be distributed between the attorneys, nor did he sufficiently allege that there was any condition attached to the substituted agreement.

nor did he offer to prove any. He withdrew a question that might have broug out the existence of a condition, if there were any, and while his counsel argued later that the agreement was conditional, we find no offer to prove that to be the fact.

It seems to us that the real matter behind this is whether Mr. Crossland and Mr. Evers shall get more by Paul Avis getting 50 per cent. of the fees instead of the 20 per cent., a matter with which we are not, and should not be, concerned. We find no legal connection attempted to be made between them and any of the attorneys. We think that the ends of justice as to the 20 per cent. requires that the parties be left as to the agreed percentage as they now stand upon the record, he having agreed to take it and having not sought to prove, and having not even alleged, any condition attached to the agreement, and they having offered such defenses as they could offer against it, with the clear weight of the evidence showing an agreement that he should have 20 per cent., and being against their offered defenses.

This leaves for consideration only the matter of the alleged estoppel by receipt of the $500 and retaining it without objection. It does not appear that he was required to accept it as full payment, and it was less than he was entitled to have, as he should have had $1,900, which was 20 per cent. of the $9,500. Further, it was accepted under a misapprehension as to the real facts, and this misapprehension was due to their assertion that they had recovered less than $10,000, not bringing to light the recovery of this property interest to which the contract entitled the attorneys to one-half. Here again we find a conflict in the evidence, they asserting that the check was given to Mr. Crossland because he came to their office to bring a letter from Mr. Avis asking him to see Martin & Moss and get for him what might be coming to him. Mr. Avis denied writing any such letter, and Mr. Crossland had no recollection of ever having received such a letter, and the weight of the evidence seems to preponderate in favor of his statement that he went to their office to get what might be coming to him out of the settlement, and that he got $1,000 for himself and Mr. Evers, in one check. or in two checks, and that Mr. Evers found half that amount deposited to his credit when he returned to the city and was asked by Mr. Martin if he had received it. But since the evidence shows no agreement that he should have only a reasonable fee, but

rather that he should have 20 per cent., it is immaterial whether Mr. Crossland also had any such letter when he went to the office. It is not denied that Paul Avis was ignorant of the recovery of the half interest in the future estate. They took the position that it was not his concern. He was told by Mr. Crossland, who said that he got that information from Martin & Moss, that they had recovered less than $10,000, and that the expenses were heavy. Manifestly, he accepted the $500 under a mistake of fact at least. If we should say that, although dissatisfied, he accepted it without complaint in view of the great amount of work that had been done, in view of the fact that they had done practically all of it so far as management of the litigation was concerned, and that there were heavy expenses, and further considering their experience and prominence and what would be thought reasonable for the amount of work done, we are of the opinion that his ignorance of the recovery of the future estate was ignorance of what was not immaterial. True it was a contingent interest, but it would result in a very considerable fee if it should vest. Certainly this would not debar him from asserting a 20 per cent. interest in the future estate, nor can we conclude that it would bar him from insisting upon 20 per cent. of the $9,500 which had been received, for that was not accepted with a knowledge of what we may conclude were all the material facts. Under such circumstances we conclude that Paul Avis is entitled to 20 per cent. of the one-half of the assets belonging to the attorneys of Mrs. Vance after the costs upon the claim of Martin & Moss have been deducted from the entire fund, in other words, 20 per cent. of the gross recovery of Martin & Moss in the assets in the condition in which they are when the trial court shall make distribution, and that he is further entitled to be paid out of the attorney's one-half of the fund the sum of $1,400, which is the difference between the $500 received and the $1,900 which he should have received, out of the $9,500 paid to Martin & Moss by Mrs. Vance, with legal interest on the $1,400, with annual rests, from February 2, 1917, the date he received the $500 payment. Costs taxed upon the prosecution of the claim of Mr. Avis against Martin & Moss shall be paid by Martin & Moss.

The distribution of the fund which the trial court is to make as determined upon consideration of both appeals is as follows:

The costs upon the claim of Martin &

Moss shall be paid from the fund; then the trust assets representing the future estate of Mrs. Vance shall go one-half to her and one-half to her attorneys in their then condition, without other liability of Mrs. Vance; that proof shall be taken to determine what, if anything, Martin & Moss received in distribution of the son's estate, any amount so received to be surcharged against them and paid to Mrs. Vance; that 20 per cent. of the one-half going to the attorneys, without deduction for the above mentioned surcharge, go to Paul Avis; that in addition there be paid to Paul Avis the sum of $1,400 out of the remaining part of the one-half, with legal interest with annual rests, from February 2, 1917; that out of the remainder left to go to Martin & Moss there be deducted and paid the costs upon the claim of Paul Avis, the net amount then remaining to be paid and delivered to Martin & Moss as their net recovery.

However, since when a court of equity takes jurisdiction over a controversy it should grant full relief to the parties, before distribution is made to Mrs. Vance, a proper conveyance shall be made by her of one-half of the three-eighths interest in the allotment. Paul Avis is entitled to a one-fifth interest under whatever conveyances she has made or shall make. The conveyance purporting to convey an undivided one-sixth interest in the allotment and the assignment purporting to assign one-sixth of the proceeds of production from the allotment, were undoubtedly followed by conveyances from the attorneys to the testator's father upon settlement of the litigation over Benjamin Vance's estate, but, however that may be, they did not purport to convey proper fractional interests, and it was the intent of the agreement of February 8, 1917, that a further conveyance should be made, and she should perform. She shall, therefore, execute a special warranty deed convenanting to warrant and defend against the lawful claims of all persons claiming by, through, or under her, conveying to the attorneys an undivided three-sixteenths or fifteen-eightieths interest in the allotment, which is an undivided one-half of her undivided three-eighths, but an undivided three-eightieths, or one-fifth of said fifteen-eightieths, shall be conveyed to Paul Avis, and only the remaining twelve-eightieths, or four-fifths of said fifteen-eightieths, to the other attorneys or their representatives, said conveyance to recite that it is executed in performance of said agreement of February

8, 1917, and in accordance with the judgment of this court adjudicating said Paul Avis to be entitled to a one-fifth interest in said agreement of February 8, 1917, and to a conveyance of one-fifth of said one-half interest in said undivided three-eighths therein agreed to be conveyed.

The decision of the trial court on the claim of Martin & Moss is affirmed as modified above as a recovery for the attorneys, and its decision upon the claim of Paul Avis is reversed, and it is instructed to proceed with the distribution of the trust estate as above provided.

CULLISON, V. C. J., and ANDREWS, McNEILL, OSBORN, BAYLESS, BUSBY. and WELCH, JJ., concur. RILEY, C. J., not participating.

---

Modification of Opinion as to Distribution.

SWINDALL, J. In a motion filed by the administrators of the estate of H. B. Martin, deceased, and A. F. Moss, it is asserted that Martin & Moss obtained a personal judgment against Mrs. Vance and the trustee for $69,553.68, which upon order was paid into court, and that they obtained a personal judgment against Mrs. Vance for $3,132 38. They assert that the trustee had taken over all of the securities, and that at the date of this so-called judgment, all of the assets were in money with the exception of the real estate ordered by the judgment to be conveyed. They then point out that by this conversion the trust had terminated, and that, since they had these personal judgments, execution of which had been stayed by the supersedeas bond, they are entitled to judgment upon the supersedeas bond in these appellate proceedings, and that it is beyond the power of this court to deny them legal interest on the judgment.

We will consider the matter of interest later. At present the writer admits that after reading the entire record he turned back and spent a great deal of time upon that part of it which had to do with the main issues, whether the attorneys could participate in the distribution, and, if so, to what extent, if any, Paul Avis might participate. The record of those two hearings was gone over again and again considering the evidence in its entirety with respect to this part of it, and that part of it, to be certain that what seemed a fair conclusion from parts of it might not be unfair in the light of all of it, and not only was this a long-drawn out task, but in ad-

26

dition to that it was necessary to permit recovery on some theory not advanced by the attorneys, for the two contentions urged by them, that they made her the heir of the child, and that the estate came to her strictly by inheritance, were utterly untenable.

After all of that, the writer being of the opinion that something said about the trustee taking over the securities had not been carried out, and that there had been only a partial distribution, and, not having 'n mind any necessity of doing more than lay down general instructions for orders of distribution, merely equalizing certain inequalities mentioned in the opinion, overlooked the fact that there had been a few items surcharged against Mrs. Vance, those being the items making up the $3,132.38.

As a matter of fact, the attempted abortion of the proceedings, those to settle a trustee's accounts and to order distribution, into proceedings for specific performance of a contract, induced proceedings well calculated to lead one into the conclusion that there had been but an order for partial distribution.

The case-made contains 908 pages. The proceedings on the Martin & Moss claim ran to page 407. The proceedings on the Avis claim ran to page 830, including the exhibits and clerk's minutes showing purported judgments, one in favor of Martin & Moss, and one against Paul Avis. Subsequently a witness was called to testify as to some item of expense, and while he was on the stand it was agreed between the parties (not including the trustee) by a stipulation merely dictated to the reporter, that the trustee might take over the securities at principal plus accrued interest. The next day another stipulation was dictated to the court reporter, covering the few items of surcharge, and also stipulating that the trustee had on hand the sum of "blank dollars," followed by these few words, "including the proceeds of the sale of the mortgage securities," and stipulating that the trustee had on hand bonds of the value of "blank dollars." The last report filed by the trustee had been filed July 13, 1928, running to July 11, 1928, just prior to the hearing on the Martin & Moss claim, and it showed cash in the sum of $1,118.05, and savings deposits, which were practically cash, in the sum of $124,515.04 and also showed mortgages in the amount of $149,725, and bonds in the sum of $10,000. No further report was ever filed by the trustee. No order was ever made permitting it to take over the securities individually, nor was any order made confirming any such conduct. After these proceedings followed the findings of fact, in which the court found that the trustee had on hand $139,107.37, and was in possession of certain described real estate, making no mention of securities. Of course, the testator's mother, individually and as administratrix of the estate of the testator's father, had a half interest in the assets shown in the report of July 13, 1928, but it is to be observed that the money on hand, according to the findings of fact, was very little above the amount shown in the report of July 13, 1928. Even in this so-called judgment, it was expressly provided that the judgment for $3,132.38 should be a lien on all of Mrs. Vance's interest in property in the hands of the trustee. The proper way to have conducted the proceedings was in harmony with their object and to carry out the jurisdiction invoked by the filing of the trustee's account, and there should have been a supplemental account filed showing balance on hand July 11, 1928, subsequent receipts and disbursements, and especially a charge against the trustee for money paid by itself individually for the mortgage securities, and that account should have been approved, and, not only as a muniment of title to the Exchange Trust Company, but as well for the mortgagors, to constitute authority to release in its individual capacity, there should have been an order confirming the taking over of the securities; and also there should have been an order distributing the entire estate, rather than a purported judgment in the form of a judgment for specific performance.

They say that since giving the supersedeas bond Mrs. Vance has been in possession of the entire estate. We find no order distributing her interest to her, the last entry as to her interest being the one in the so-called judgment establishing the $3,132.38 as a lien on her interest in property in the hands of the trustee. However, the proceedings indicate that probably that assertion is true, for it was provided in the order overruling the motion for a new trial that upon approval of the bond the $69,553.68 paid into court on the so-called judgment should be paid to her, and that she might collect $28,885.68 due from the Magnolia Petroleum Company, and might collect for future production.

The writer concedes that he should have again gone carefully over this subsequent record, and was remiss in concluding that the purpose of having the trustee take over the mortgages had not been effected, and in overlooking these items of surcharge and the peculiar manner in which the estate was handled in the order overruling the motion

for a new trial. We shall have to consider the judgment for the $3,132.38 for the surcharged items, and, since the $139,107.37 on hand November 26, 1928, covered everything but the real estate and production not paid for, we may make more definite orders as to distribution, although a subsequent accounting will be necessary as to some items, as in any event it would have been required. We shall proceed to state the account as far as our decision bears upon certain items, and, so far as she is in possession, an order of distribution as to her will be unnecessary, and an order may be made to pay the attorneys whatever sums may be the total amount credited to them respectively upon final accounting. We shall for the present deal merely with principal, leaving consideration of interest to the last.

Out of the $139,107.37 on hand November 26, 1928, Mrs. Vance shall be credited with one-half, or $69,553.69, and the attorneys shall be credited with the other half, $69,-553.68. The costs on the Martin & Moss claim to and including receipt of the mandate of this court shall be charged one-half against Mrs. Vance and one-half against the attorneys. The balance of the $69,553.68, credited to the attorneys, after deduction of the one-half of said costs, shall be handled as follows: Twenty per cent. (20%) shall be charged out and credited to Paul Avis; an additional $1,400, with legal interest from February 2, 1917, shall be charged out and credited to Paul Avis; the costs on the claim of Paul Avis to date of receipt of the mandate of this court shall be charged out; if Martin & Moss received anything in distribution of the child's estate, that amount shall be charged out to them and credited to Mrs. Vance. Since the claims against the $8,000 in process of administration were reduced by claims to $3,500, and the administrators by stipulation were allowed $12,000 out of the trust assets, it may be that they retained that $3,500 for allowances, but the facts should be investigated as to distribution in the county court; the final balance remaining out of said $69,553.68 shall be credited to Martin & Moss.

Mrs. Vance shall be charged with the $3,-132.38, credited one-fifth to Paul Avis and four-fifths to Martin & Moss.

Mrs. Vance shall account for the attorney's interest in all moneys received by her in payment for production, to be credited one-fifth to Paul Avis and four-fifths to Martin & Moss.

Mrs. Vance shall account for the attorneys'

interest in rent for her use and occupation of the residence on South Lewis at what from time to time may have been a fair monthly rental since November 26, 1928, and shall account for their interest in rents actually collected by her since that date on another tract of rental property located at 1102 East 17th Place, to be credited one-fifth to Paul Avis and four-fifths to Martin & Moss.

Mrs. Vance shall account for the attorneys' interest in all collections made by her upon a contract of sale of real estate mentioned in the proceedings, to be credited one-fifth to Paul Avis and four-fifths to Martin & Moss, and she shall make proper conveyances to them of their interest in like proportions, unless the contract has been paid out and conveyance has been made to the purchaser.

The court shall require proper conveyances to be made of the attorneys' interest in other real estate, in the proportions of one-fifth of the interest to Paul Avis and four-fifths to A. F. Moss and the representatives of the estate of H. B. Martin, deceased, the conveyance of interests in the allotment to include like proportional interests in oil, gas and other minerals, subject to any existing lease, and like interests in production not paid for; and the court shall require execution of proper division orders.

We shall now consider this matter of interest on the share of the attorneys: The argument as to the termination of the trust, the money judgments, and supersedeas bond, has no appeal. We do not recognize the power to deprive the court of jurisdiction to proceed under the petition of the trustee for approval of its accounts and for distribution of the estate, or to deprive it of power to effect such results in accordance with the doctrines and principles of equity jurisprudence. But even had they the right to convert the proceedings into a suit for specific performance, as this so-called judgment plainly tried to do, as the so-called money judgments were followed by orders for conveyances, as they will observe if they read it, still, they would be seeking an equitable remedy, one not demandable as of right, but only under such equitable terms and conditions as to the court might seem proper, in the determination of which the appellate court could not be trammeled or deprived of jurisdiction by any judgment or order of the trial court, so that the supersedeas bond will secure only what is finally determined to be due.

Mrs. Vance must account for the amounts

28

of final credits made in favor of the attorneys, but this court adheres to the position taken in the opinion with respect to interest, for the reasons stated in the opinion. So, no interest shall be allowed on the attorneys' share, except to the extent that it can be ascertained upon an accounting that she has earned interest upon it. It is highly probable that to obtain the supersedeas bond in the penal sum of $200,000, it was necessary for her to deposit in some bank at some agreed rate of interest, subject to joint control, or to deposit with the surety on an agreement for some agreed rate of interest, an amount considerably in excess of any possible liability, and, if so, of the total interest so earned, they may have such proportion as their principal may bear to the whole principal so deposited. The trial court will take all necessary steps in the making of proper orders of distribution and carrying them into effect.

In all probability the trial court has before this time been required to enter some sort of order confirming title to the mortgages in the trustee in its individual capacity as a basis for authority to so release the mortgages, but, if not, for the benefit not only of the trustee, but also of the mortgagors, it will enter a nunc pro tunc order confirming such title as of the date the mortgages were taken over by the trustee individually.

Of course, the supersedeas bond secures such final distribution as may finally be ordered under the modifications made by this court in affirming the trial court, and the orders, since Mrs. Vance was put into possession of all of the estate, will run against her.

Rehearing denied.

CULLISON, V. C. J., and ANDREWS, McNEILL, OSBORN, BAYLESS, BUSBY, and WELCH, JJ., concur. RILEY, C. J., not participating.